

O

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| **ALEXANDER MEZHBEIN,**<br><br>**Petitioner,**<br><br>**v.**<br><br>**J.F. SALAZAR, GOVERNOR ARNOLD SCHWARZENEGGER, BOARD OF PAROLE HEARINGS,**<br><br>**Respondents.** | **)** | **CASE NO. CV06-8059 DOC (MLG)**<br><br>**<u>O R D E R</u> (1) VACATING GOVERNOR'S DECISION; (2) REINSTATING PAROLE BOARD'S DECISION; (3) PROVIDING TIME FOR REVIEW; and (4) SETTING HEARING** |

The Court again considers its Order to Show Cause issued on July 18, 2008. After considering the response to that Order, and the parties' oral argument, the Court hereby ORDERS the following: 1) the Governor shall immediately vacate his Order reversing the Parole Board's decision; 2) he shall then enter an order in compliance with this Court's decision, if any, within 30 days; 3) the Parole Board's Decision setting a release date for petitioner shall be reinstated in the interim and control if the Governor does not issue a constitutionally compliant Order; and 4) the parties shall appear at a hearing on October 6, 2008.

**I. BACKGROUND**

Petitioner was born in 1953 in what is now Kiev, Ukraine. He and his parents immigrated to San Francisco as Jewish refugees in 1975. Petitioner worked for three years designing and assembling window displays. He was then laid off and found a job installing and manufacturing kitchen cabinets. After a few months his employer went bankrupt and terminated him. During this period Petitioner also ended his first serious romantic relationship due to his parents' disapproval. Finally, around the same time, Petitioner's grandmother died. These and other factors contributed to Petitioner becoming depressed.

For the next several months Petitioner tried to find full-time employment and resume his relationship. He was unsuccessful and began to drink excessively.

On March 25, 1980, Petitioner set out to go target shooting at a firing range in San Francisco because it required concentration and calmed him down. He loaded a rifle into his van for this purpose. While he was preparing to go to the range, a former employer contacted Petitioner for a few hours of work. Petitioner went to work and never made it to the firing range. After finishing work, Petitioner drank heavily for several hours.

Shortly before 12:45 a.m. on March 26, 1980, Petitioner picked up a "streetwalker," 18-year-old victim Carmella Broxie. They engaged in sexual activity, but Petitioner was unable to achieve orgasm. The victim became "disgusted" and demanded more money. An argument ensued and, according to Petitioner, the victim pushed him and grabbed the rifle. The two began struggling for the rifle and Petitioner shot the victim two times in the chest. She then exited the van and stumbled towards the street. A passerby saw her and called for an ambulance. The victim later died from her injuries.

Petitioner testified that he was in a haze at the time and that his memory is unclear. He recalls inspecting the inside of the van and, finding no bullet holes, starting to drive home. On his way home, a number of prostitutes approached Petitioner at a stop light. Petitioner invited one to come inside the van, which she did. She claims that he held a rifle on her. He contests this allegation. In any event, the two engaged in sexual activities. Police entered the van while this was taking place and arrested Petitioner.

He was tried to a jury and convicted of Second Degree Murder, assault with a deadly weapon, and assault with intent to commit a felony with a firearm. He was sentenced to 17 years to life: 15 years to life for Second Degree Murder and a two-year enhancement for using a firearm.

Petitioner has served 28 years in prison based on this conviction.

Early in his prison term, psychiatrists noted that Petitioner was severely depressed for a number of reasons, including difficulty in adjusting to this country and the negative events detailed above. However, beginning with his evaluation in 1985, Petitioner showed marked improvement. Each of his evaluations since 1982 recognized that Petitioner had a minimal potential for violence. Dr. Mura, the evaluating psychologist in 2004, stated that Petitioner had "several positive factors for parole."

Petitioner has completed several programs in alcohol abuse, substance abuse and interpersonal skills. He actively participated in Alcoholics and Narcotics Anonymous programs and one-on-one and group therapy. As a result, he has stayed sober since entering prison.

Over the course of his 28 years there, Petitioner has three reported instances of misconduct: an 1981 refusal to show up at a work assignment; a 1996 misuse of telephone; and a 2000 refusal to change beds. This refusal to change beds was based on Petitioner not wanting to move into an area well known for drug use.

Petitioner has also improved professionally. He has earned a GED, bachelor and masters degrees in psychology, and numerous vocational certificates. He has a history of "exceptional" and "satisfactory or better" work evaluations. In 2004, although he has no children, Petitioner completed a parenting class because it was the only self-help program he had not yet completed. He has been offered several permanent jobs as well as a place to live in San Francisco if he is released. However, Petitioner is not likely to be released to San Francisco. Instead, federal immigration officials have placed a deportation hold on Petitioner. Petitioner will be remanded to federal custody and considered for deportation to the Ukraine.

Petitioner's "Minimum Eligibility Parole Date" was July 23, 1989. His first parole

suitability hearing was March 14, 1990. He was denied parole. Between 1991 and 2006, Petitioner was denied parole another eight times. At the last hearing, the Parole Board concluded that the crime itself was heinous enough to justify denying parole. It also concluded that Petitioner did not have sufficient plans for a place to live and work if deported to the Ukraine. The Parole Board discounted the fact that Petitioner was unable to make such plans due to the Ukranian authorities' non-cooperation. Finally, the Parole Board concluded that Petitioner needed more therapy and self-help programs.

On a habeas petition, the State Superior Court found that the only basis justifying the denial of parole was the nature of the offense itself.

After exhausting his state law remedies, petitioner filed for a writ of habeas corpus in Federal Court on December 18, 2006. In essence, Petitioner claims that it is improper for the Parole Board to continue denying his parole based solely on the nature of his underlying offense.

On August 22, 2007, Magistrate Judge Goldman provided the Court a well-reasoned Report and Recommendations stating that the Parole Board violated Petitioner's due process rights by denying him parole without "some evidence" of his dangerousness to society. According to California regulations, the crime itself can only be the basis for a denial where it is "especially heinous, atrocious and cruel" and the board can point to "factors beyond the minimum elements of the crime" to show dangerousness. 15 CCR § 2402(c)(1). Further, even if the crime is particularly callous or cruel, its relevance to a parole determination will fade over time. *Biggs v. Terhune*, 334 F.3d 910, 916-17 (9th Cir. 2003).

On October 22, 2007, this Court adopted Judge Goldman's Report and Recommendations and ordered the Parole Board to decide upon a release date within 45 days. After this 45 days had passed, on December 11, 2007, Respondent filed a Motion for Extension of Time to Appeal. On the same day Respondent did appeal to the Ninth Circuit.

On the following day, December 12, 2007, Respondent filed an Application to Stay the matter pending appeal. This Court denied the stay on April 28, 2008. On May 5, 2008, the Ninth Circuit also denied a stay, finding that Petitioner had a likelihood of success on the merits and that he was not a flight risk. In this Order, the Circuit directed this Court to order the Parole

Board to set a release date for Petitioner. In response, on May 15, 2008, this Court ordered the Parole Board to set a date that was no later than July 15, 2008.

The Parole Board scheduled a hearing on June 20, 2008. State law requires the Parole Board to set a release date not less than 30 days from the date of the hearing to permit the Governor to review the decision. Accordingly, even if this hearing had gone forward, the Parole Board could not possibly have complied with this Court's order to release Petitioner on or before July 15, 2008.

The Parole Board finally held a hearing on July 7, 2008. Petitioner, having insufficient access to his legal materials, refused to go forward with the June 20, 2008 hearing. At this July 7 hearing, the Parole Board determined that Petitioner was entitled to immediate release. In its decision, the Parole Board noted that it would have denied release but for this Court's Order. The Parole Board submitted its decision to the Governor for his review as required by California law.

On July 14, 2008 Petitioner filed a Motion to Secure Strict Compliance, a Motion for Subsequent Order to Discharge Petitioner and an *ex parte* Application for Clarification. Mezhbein alleged that the Parole Board failed to set his release date or release him. On July 18, 2008, the Court issued the Order to Show Cause subject of the present hearing.

On August 6, 2008, the Governor "exercised his constitutional and statutory authority to review the [Parole] Board's decision and reversed the [Parole] Board's decision granting parole." He based this decision on the heinousness of Petitioner's offense as well as his failure to take full responsibility for his actions.

## II. DISCUSSION

After considering Respondents J.F. Salazar, Governor Schwarzenegger, and the Parole Board's (collectively "Respondents") answer to the Court's Order to Show Cause, the Court is not convinced to dismiss its order. Quite the contrary, for the following reasons, the Court will direct immediate compliance with both the letter and the spirit of its prior Orders.

### A. The Court Has Plenary Authority to Grant Appropriate Habeas Relief Including Immediate Release from Custody

The Federal Habeas Statute, 28 U.S.C. § 2254(a), provides that "a district court shall entertain an application for a writ of habeas corpus . . . only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." If an unconstitutional or illegal confinement is properly presented to the Court on a writ of habeas corpus, "[t]he language of Congress, the history of the writ, [and] the decisions of [the Supreme] Court, all make clear that the power of inquiry on federal habeas corpus is plenary." *Townsend v. Sain*, 372 U.S. 293, 312, 83 S. Ct. 745 (1963). The Supreme Court has expressed the power of a Court exercising the writ in the most expansive terms:

> The scope and flexibility of the writ - its capacity to reach all manner of illegal detention - its ability to cut through barriers of form and procedural mazes - have always been emphasized and jealously guarded by courts and lawmakers. The very nature of the writ demands that it be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected.

*Harris v. Nelson*, 394 U.S. 286, 290-91, 89 S. Ct. 1082 (1969) *overruled on other grounds in Keeney v. Tamayo-Reyes*, 504 U.S. 1, 112 S. Ct. 1715 (1992). In administering the writ the Court is duty-bound to prevent a petition from "floundering in a procedural morass." *Id.* The Court has both the ability and the responsibility "to provide a prompt and efficacious remedy for whatever society deems intolerable restraints." *Fay v. Noia*, 372 U.S. 391, 401-402, 83 S. Ct. 822 (1963) *overruled in part on other grounds by Wainwright v. Sykes*, 433 U.S. 72, 97 S. Ct. 2497 (1977) *and abrogated on other grounds by Coleman v. Thompson*, 501 U.S. 722, 111 S. Ct. 2546 (1991).

The usual remedy for an unconstitutional restraint is release. *Preiser v. Rodriguez*, 411 U.S. 475, 484, 93 S. Ct. 1827 (1973) ("the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and . . . the traditional function of the writ is to secure release from illegal custody."); *Preiser*, 411 U.S. at 486 ("his grievance is that he is being unlawfully subjected to physical restraint, and in each case habeas corpus has been accepted as

the specific instrument to obtain release from such confinement.") Release is not a complex term of art. Its meaning is usually quite simple: on a successful petition, the petitioner is entitled to have his confinement end and his freedom restored. *Wilkinson v. Dotson,* 544 U.S. 74, 79, 125 S. Ct. 1242, 161 (2005) ("[T]he writ's history makes clear that it traditionally has been accepted as the specific instrument to obtain release from [unlawful] confinement" (internal quotation marks omitted)). Since at least the Seventeenth Century, the writ has been "the most usual remedy by which a man is restored again to his liberty, if he have been against law deprived of it." *Bushell's Case,* Vaughan 135, 136, 124 Eng. Rep. 1006, 1007 (1670). "[The] writ always could and still can reach behind prison walls and iron bars." *Jones v. Cunningham*, 371 U.S. 236, 83 S. Ct. 373 (1963).

Given the historical use of the writ and the traditional remedy of release, the courts' orders must be read as imperative. The clear import of the many decisions of this Court, Judge Goldman, and the Ninth Circuit is that petitioner should be placed in immigration custody in the immediate future. The Ninth Circuit's order found no irreparable harm because Petitioner would be placed in federal custody, not because the Governor has power to review a Parole Board decision. Implicit in this reasoning is the assumption that this transfer would actually occur. Further, as the Court noted in its Order to Show Cause, it goes without saying that when the Court orders the Parole Board to set a release date, it is ordering the Parole Board to actually release the Petitioner.

**B. The Governor's Reversal Is Ineffective**

Rather than comply with this Court's orders, Respondents have engaged in a course of untimeliness and delay. Respondents have failed to timely comply with this Court's Order granting the writ, file an appeal, seek a stay, or set a release date as ordered by this Court. Consequently, Respondent's claim that the Governor's decision must be subject to a new habeas suit – beginning with a petition in the state court, meandering through a state court review process, and finally making it to this Court – is not well taken. It is offensive to the interests of justice and the ultimate purpose of habeas relief – ridding individuals of illegal restraints on their freedom. The Court is profoundly concerned with adopting a course of action that would permit

Respondents to delay for another two years at minimum.

Petitioner succeeded on the merits of his petition nearly a year ago; the time has come to provide him a remedy. *See Satterlee v. Wolfenbarger*, 453 F.3d 362, 369 (6th Cir. 2006). The Court ordered the remedy of release, but deferred to state processes to effect this relief in an orderly manner. The Court has afforded the separation of state and Federal powers utmost respect in this matter. This respect has gone unreciprocated. Instead, the Governor now attempts to interfere with the clear directives issued by this Court and forestall the remedy previously awarded.

The Governor's power to review the Parole Board's decision does not trump this Court's habeas power. *See Sanchez v. Kane* (*Sanchez I*), 444 F. Supp. 2d 1049 (C.D. Cal. 2006) (granting habeas petition to overturn Governor's decision to reverse Parole Board) *reversed in part on other grounds in Sanchez v. Kane* (*Sanchez II*), 215 Fed. Appx. 698 (9th Cir. 2006) (unpublished). The clear intent of the Federal courts' orders in this case was to cause petitioner's released from state custody. Even if the Governor has authority to review the Parole Board's decision under the State Constitution, he has no authority to review this Court's orders, which are  based on the Federal Constitution. This division of authority is written directly into the United States Constitution, *see* U.S. Const. Art. VI, cl. 2 ("This Constitution . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."), and has been recognized by myriad courts. *See Dodge v. Woolsey*, 59 U.S. 331, 18 How. 331 (1885) (Constitution is supreme law of the land); *Farrington v. Tennessee*, 95 U.S. 679, 685, 5 Otto 679, (1877) (Constitution and federal laws are supreme law of the land and " as much a part of the law of every State as its own local laws and Constitution." (citing *Farmers & Mechanics' Bank v. Deering*, 91 U. S. 29 (1875)); *United States v. Germaine*, 99 U.S. 508, 510, 9 Otto 508 (1878) ("Constitution is the supreme law of the land"); *Smith v. O'Grady*, 312 U.S. 329, 331-332, 61 S. Ct. 572 (1941) (Constitution is "supreme law of the land" and state courts are duty bound to enforce the same. (citing *Mooney v. Holohan*, 294 U.S. 103, 113, 55 S. Ct. 340 (1935)); *United States v. Allegheny County, Pa.*, 322 U.S. 174, 183, 64 S. Ct. 908 (1944) ("The purpose of the

supremacy clause was to avoid introduction of disparities, confusions and conflicts which would follow if the Government's general authority were subject to local controls.") *overruled on other grounds in United States v. City of Detroit*, 355 U.S. 466, 78 S. Ct. 474 (1958). As the Supreme Court wrote in *Testa v. Katt*, 330 U.S. 386, 67 S. Ct. 810 (1947):

> [T]he Constitution and the laws passed pursuant to it are the supreme laws of the land, binding alike upon states, courts, and the people, any-thing in the Constitution or Laws of any State to the contrary notwithstanding . . .. [T]he obligation of states to enforce these federal laws is not lessened by reason of the form in which they are cast or the remedy which they provide.

*Id.* at 391 (internal quotation marks and footnote omitted).

Further, the Governor has been a party to this suit since its inception and is bound to comply with the Court's orders. *See Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14, 65 S. Ct. 478 (1945) (named parties as well as those acting in concert with named parties must comply with Court orders). The Court's broad power to effect habeas relief includes the power to bind the Governor as well as the Parole Board. Although the Court's prior orders were directed immediately to the Parole Board, they were effective against all parties. Thus, the Governor's attempt to interfere with those orders is *ultra vires*. *See Mims v. Duval County Sch. Bd.*, 350 F. Supp. 553, 553-54 (M.D. Fla. 1972).

The Court on a habeas petition need not accept continued delays, or place the form of the state decision over the substance. *See Brager v. United States*, 569 F.2d 399, 400 (5th Cir. 1978) ("the issuance of a writ of habeas corpus is governed by equitable principles.") It matters little whether the Parole Board or the Governor makes the decision to continue holding petitioner. This is the very sort of procedural roadblock that the writ was designed to bypass. Accordingly, the Governor's reversal it is not entitled to the protection of the exhaustion requirement. Instead, the Court's Order granting relief stands despite the Governor's protests.

**C. The Governor's Reversal Violates Due Process and Cannot Be Cured**

In addition to being ineffective, the Governor's decision is as constitutionally infirm as that of the Parole Board denying Petitioner's release. In the Report and Recommendations

granting habeas relief, Judge Goldman noted that the *only* factor of unsuitability supporting the Parole Board's decision was the nature of the crime itself and that all other factors supported suitability. The Superior Court likewise found that the nature of the offense was the only valid basis for the Parole Board's decision. Judge Goldman further found that the nature of the crime was insufficient to warrant further detention. This Court adopted Judge Goldman's findings, and the Ninth Circuit stated that Petitioner was likely to prevail on appeal.

The Governor based his decision on "the gravity of the murder committed by Mr. Mezhbein, along with the evidence that he does not fully accept responsibility for his actions . . ..." Failure to accept responsibility is not an enumerated circumstance bearing on unsuitability. 15 C.C.R. § 2402 (c) (listing circumstances as: (1) heinous nature of crime; (2) previous record of violence; (3) unstable social history; (4) sadistic sexual offenses; (5) psychological factors; and (6) institutional behavior). Nor is it a factor showing that the offense was particularly heinous, atrocious or cruel. *See* 15 C.C.R. § 2402 (c)(1)(A-B) (factors include: (A) multiple victims were attacked;[1] (B) dispassionate and calculated commission; (C) abuse, defiling or mutilation of victim; (D) exceptionally callous disregard for human suffering; and (E) motive is inexplicable or trivial). Accordingly, Petitioner's failure to "fully accept responsibility" cannot support denial. This leaves only the "gravity of the murder" to support the Governor's decision.

Because the Governor's decision only rests on the very basis rejected by this Court as unconstitutional, it is also unconstitutional. An unconstitutional decision remains invalid regardless of who appends his signature to it. *Walker v. City of Birmingham*, 388 U.S. 307, 346, 87 S. Ct. 1824 (1967) (Brennan, J. dissenting).

Further, the Governor cannot cure unconstitutionality. This Court previously determined that the Parole Board's decision was not supported by any evidence. On review, the Governor must consider the same set of factors as the Parole Board and base his decision on record

---

[1] The Governor discussed the fact that multiple victims were attacked in his Order. As addressed below, the Court previously found that the circumstances of the crime were insufficient to continue holding Petitioner based on the "some evidence" standard. Accordingly, this basis cannot support the decision.

evidence. *See In re Rosenkrantz*, 29 Cal. 4th 616, 625-26 (2003) (California Law "does not grant a Governor unfettered discretion over parole matters, but rather explicitly requires his or her parole decision to be based upon the same factors that the Board is required to consider."); *In re Smith*, 109 Cal. App. 4th 489, 505 (2003) (evidence not before the Parole Board "cannot constitute evidence in support of the Governor's decision.") Because the Court has previously held that record contained no evidence to support denying parole, it would be impossible for the Governor, considering the same evidence, to deny parole.

**D. Vacating the Governor's Decision With Directions and Reinstating the Parole Board's Decision Is Appropriate**

For the reasons elaborated above, Respondents' contention that the Governor's decision is not susceptible to review and must be vetted through a new state habeas proceeding is unpersuasive. Not only does this smack of an improper procedural tactic designed to delay Petitioner's release, it would be a futile. *Munchak Corp. v. Cunningham*, 457 F.2d 721, 725 (4th Cir. 1972) ("Equity does not require the doing of a futile act as a condition to the granting of equitable relief.")

There is only one course of action that comports with due process – releasing Petitioner as soon as possible, after already having served 28 years on a 17-years-to-life sentence. The Superior Court has already established that the only factor favoring detention was the nature of the crime. This Court, based on Judge Goldman's Report and Recommendations confirmed this and found that there was insufficient evidence to hold Petitioner on this basis. There is simply nothing left to consider.

Where the Governor improperly reverses the Parole Board's decision, the appropriate remedy is to direct him to vacate that decision, to reinstate the Parole Board's decision, and to instruct him to issue a constitutionally permissible decision. *See In re Capistran*, 107 Cal. App. 4th 1299, 1307 (Ct. App. 2003) (reversing Superior Court's order of immediate release and directing Superior Court to vacate Governor's order and direct him to issue an order in compliance with applicable law); *Sanchez II, supra*. (affirming District Court's grant of habeas

petition but reversing immediate release, and directing district court to "direct the Governor to vacate his . . . decision denying parole.") In this case a constitutionally permissible decision is one that causes Petitioner to be released to immigration custody.

It is not clear that the Court must give the Governor this deference where his decision is simply an ineffective attempt to forestall enforcement of a court order. Thus, it may be permissible to simply order Petitioner's release. However, in an abundance of caution the Court will give the Governor the opportunity to correct his decision.

Finally, to assure compliance with this and future directives, the Court has authority to require Respondents to produce Petitioner in person at future hearings. *Price v. Johnston*, 334 U.S. 266, 283, 68 S. Ct. 1049 (1948) ("The historic and great usage of the writ, regardless of its particular form, is to produce the body of a person.") *overruled on other grounds in McCleskey v. Zant*, 499 U.S. 467, 111 S. Ct. 1454 (1991). The Court will exercise this power here.

**III. DISPOSITION**

For the reasons identified above, the Court hereby ORDERS as follows:

1) The Governor is hereby DIRECTED to vacate his decision reversing the Parole Board's most recent decision in this matter;

2) The Parole Board's decision is hereby REINSTATED and shall control should the Governor fail to issue a decision within thirty (30) days;

3) The Governor SHALL have thirty (30) days to enter a decision that is compliant with the decisions of this Court, Judge Goldman and the Ninth Circuit – i.e. a decision based on constitutionally permissible factors, directing that petitioner be released to immigration custody forthwith;

4) The parties are hereby ORDERED to appear at a hearing on October 6, 2008 at 8:30 a.m. to assure that this Court's orders are complied with. Respondents are hereby PERMITTED to appear through Counsel. Respondents are hereby ORDERED to produce Petitioner in person at said hearing. Petitioner SHALL be represented by counsel at this time;

5) The parties are hereby ORDERED to take all necessary steps to assure that this Court's directives are satisfied.

IT IS SO ORDERED.

DATED: August 20, 2008

David O. Carter

DAVID O. CARTER
United States District Judge